## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHRISTINE BAKER individually and on behalf of all others similarly situated,

     Plaintiff,

v.

CRODA, INC.,

     Defendant.

Case No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Christine Baker ("Plaintiff"), individually and on behalf of a putative class of all similarly situated persons ("Class Members" or the "Class"), sues Defendant Croda, Inc., ("Croda" or "Defendant"), and based on personal knowledge and on investigation of counsel and review of public documents and information, alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this class action against Croda, the owner of the Atlas Point manufacturing facility in New Castle, Delaware, for damages resulting from its dangerous and reckless emission of Ethylene Oxide.

2.    Ethylene Oxide is a powerful cancer-causing gas. The United States Environmental Protection Agency ("EPA"), the National Toxicology Program, the World Health Organization ("WHO"), and the International Agency for Research on Cancer ("IARC"), among others, all classify Ethylene Oxide as a known human carcinogen.

3.    Croda's Atlas Point facility produces surfactants – surface-acting agents – compounds that lower the surface tension between two liquids, between a gas and a liquid, or between a liquid and a solid allowing them to bind. Surfactants may act as detergents, wetting agents, emulsifiers, foaming agents, and dispersants. The surfactant manufacturing process

requires the use of Ethylene Oxide. During the manufacturing process, Ethylene Oxide is emitted into the atmosphere by Defendant in both controlled and uncontrolled releases.

4.      Plaintiff and Class Members have lived within the vicinity of Defendant's Atlas Point facility, and have been exposed to large volumes of toxic, cancer-causing Ethylene Oxide. Although Ethylene Oxide is odorless and colorless, and Plaintiff and Class Members can neither see nor smell the gas, it is all around them, and in the air they breathe.

5.      As a result of their exposure to the Ethylene Oxide emitted by Defendant, Plaintiff and Class Members acquired disease risks among the highest in the United States. Indeed, the EPA estimates that Class Members are up to 4 times more likely to develop cancer than the average American.

6.      As a result of Croda's irresponsible and reckless conduct, Plaintiff and Class Members have been exposed to a known carcinogen in a manner that has resulted in a material health risk to them and now requires medical monitoring to mitigate their increased risk of developing cancer, including screening, monitoring, and checking to detect any abnormalities that may be indicative of cancer, and to ensure that latent disease processes can be immediately identified and aggressively treated.

7.      Plaintiff, individually and on behalf of Class Members, seeks compensatory damages arising out of chemical releases, discharges, and leaks from Croda's Atlas Point facility. These damages include the cost of a medical monitoring program for continual screening and detection of illness, disease, or disease processes necessitated by the exposure to toxic Ethylene Oxide released by the Defendant.

## **PARTIES**

8.      Plaintiff Christine Baker is a citizen of Delaware and lives in New Castle County.

As a result of Defendant's operations at Atlas Point, Plaintiff has been exposed to, and inhaled, high levels of Ethylene Oxide.

9.      Croda is a New Jersey corporation with its principal place of business at 300-A Columbus Circle Edison, New Jersey, 08837. It is the sole owner and operator of Atlas Point located at 315 Cherry Lane, New Castle, Delaware, 19720. The Atlas Point facility has been in its current location since 1937 and was purchased by Croda in 2006.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative Class Members, and at least some Members of the proposed Class have a different citizenship from the Defendant. This Court also has proper jurisdiction under 28 U.S.C. § 1332(a)(1) as the parties are citizens of different states.

11.     This Court has jurisdiction over Croda because it is headquartered in this District. Through its business operations in this District, Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant's principal place of business is in this District and because a substantial part of the events and omissions giving rise to this action occurred in this District.

## STATEMENT OF FACTS

**A.      ETHYLENE OXIDE**

Ethylene Oxide ("EtO") is a colorless, odorless gas used in the manufacture of antifreeze, solvents, detergents, polyurethane foam, adhesives and other products.  It is also used to sterilize

medical equipment and plastic devices.[1]

13.     Commercial medical equipment sterilizers use Ethylene Oxide to sterilize health care products. The EtO sterilization process begins by placing medical equipment in a gas chamber. After air is pumped out of the room, EtO is introduced and allowed to diffuse into the products for several hours. Once the medical equipment is sterilized, EtO is pumped out of the chamber and the remaining EtO is allowed to slowly dissipate.

14.     Commercial chemical producers process EtO to synthesize Ethylene Glycol, a building block for synthetic fibers (e.g., upholstery, carpet), plastics, PVC pipe and cosmetics and as well as a primary ingredient in antifreeze.[2]

15.     At the end of 2018, EtO was being produced in the U.S. at 15 facilities in 11 locations by 9 companies.[3]

16.     Defendant's Atlas Point facility manufactures and emits significant volumes of EtO gas every year. Since at least 1988, Atlas Point has emitted multiple tons of Ethylene Oxide gas into the air and the surrounding communities.[4]

17.     Unfortunately, people cannot see or smell EtO when it is in the air.[5] As such, Plaintiff and Class Members have unknowingly been exposed to carcinogenic Ethylene Oxide for decades while Croda knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

**B.     HEALTH EFFECTS OF ETHYLENE OXIDE EXPOSURE**

18.     EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics." It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly

---

[1] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what
[2] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[3] https://www.americanchemistry.com/EO/Ethylene-Oxide-Frequently-Asked-Questions.html
[4] *See e.g.* Air Pollution Report, https://echo.epa.gov/air-pollutant-report?fid=110000338652
[5] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions

reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

19.    While acute inhalation exposure to high concentrations of EtO can cause headache, dizziness, nausea, fatigue, respiratory irritation, vomiting and other types of gastrointestinal distress, studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer in females.[6]

20.    Manufacturers and users of EtO became broadly aware of its carcinogenic effects in 1977, when the National Institute of Occupational Safety and Health ("NIOSH") recommended that EtO be considered as mutagenic and potentially carcinogenic to humans, that occupational exposure be minimized, and that alternate sterilization procedures be used.[7] In 1981, based on additional lab studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[8]

21.    In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

22.    In 1987, the state of California officially designated EtO a carcinogen.

---

[6] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide
[7] Center for Disease Control & Prevention, Special Occupational Hazard Review With Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html
[8] Center for Disease Control, Current Intelligence Bulletin 35, May 1981, EtO: Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

23.    NIOSH subsequently published an epidemiological study of EtO which analyzed over 18,000 employees working with EtO at 14 different industrial facilities. The study found sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers.[9]

24.    As a result of these findings and others, in 1994 the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO as "known to be a human carcinogen."

25.    Exposure to EtO has been widely studied and its negative health effects are well documented.[10] Presently, there is evidence linking EtO exposure to increased risk of lymphatic and hematopoietic cancer such as lymphomas, myelomas, and leukemias; breast cancer; tumors in the lungs, uterus, and the brain; cancers in connective tissues and bones; and reproductive and developmental impairments including increased rates of miscarriage and infertility.

26.    EPA classified EtO as a human carcinogen in December 2016 and considers any exposure, however small, to create cancer risk. This is because EtO is a powerful mutagen and can damage DNA.[11]

27.

## C.    CRODA'S ETHYLENE OXIDE EMISSIONS

28.    Croda's Atlas Point facility produces up to 30,000 metric tons of Ethylene Oxide annually which is used surfactant production and creation of  Ethylene glycol, a liquid used as a

---

[9] Steenland, K *et. al.,* Mortality analyses in a cohort of 18,235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998 (2004), Occup Environ Med 61:2-7, https://www.ncbi.nlm.nih.gov/pubmed/14691266
[10] https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-oxide.pdf
[11] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide

raw material in the manufacture of polyester fibers and for antifreeze formulations.[12] In the course of these processes, Defendant releases huge volumes of EtO gas every year. Since at least 1988, the Atlas Point plant has emitted multiple tons of EtO gas into the air and surrounding communities.

29.    The EtO emitted by Defendant's Atlas Point facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiff and Class Members breath long after it has been emitted.[13]

30.    In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[14] Consequently, Defendant's releases of EtO are likely to have lingered at breathing level in the communities around its facility for a considerable time, causing ongoing and prolonged harm to Plaintiff and Class Members.

31.    Unfortunately, people cannot see or smell Ethylene Oxide when it is in the air.[15] As such, Plaintiff and Class Members have unknowingly been exposed to carcinogenic EtO for decades while Defendant knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

**D.    NEW CASTLE AIR QUALITY AND THE HEALTH IMPLICATIONS**

32.    The Atlas Point facility has been in operations since 1937. In 2015, Croda announced that it was adding a new plant to Atlas Point which would provide it the ability to produce Ethylene Oxide directly on site.[16]  The plant was opened in October 2017.

---

[12] What else is at plant where gas leak that shut down Delaware Memorial Bridge occurred?, Delaware online, November 26, 2018, https://www.delawareonline.com/story/news/local/2018/11/26/what-else-delaware-plant-where-dangerous-gas-leak-occurred/2112981002/
[13] https://www.ncbi.nlm.nih.gov/books/NBK321408/
[14] https://www.atsdr.cdc.gov/mmg/mmg.asp?id=730&tid=133
[15] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[16] https://cen.acs.org/articles/93/i18/Croda-Produce-Bio-Ethylene-Oxide.html

33.    On  November 25, 2018 Atlas Point reported an emissions accident at the new EtO production facility which resulted in the release of 2,688 lbs. of Ethylene Oxide into the already highly polluted air surrounding the facility.[17] A call was sent out through the Delaware Emergency Notification System ("DENS") to advise residents in the nearby area to seek shelter. The massiveness of the release resulted in the closure of the Delaware Memorial Bridge for a period of 7 hours.  In addition to the tons of EtO released into the air, 700,000 gallons of deluge water,  used by Croda to minimize the ambient air concentration of Ethylene Oxide and to minimize the risk of explosion or ignition of the released Ethylene Oxide, overflowed the spill sump and discharged onto the ground and into the wooded area behind the facility.

34.    On March 28, 2019 Croda entered into a settlement agreement with the State of Delaware Department of Natural Resources and Environmental Control ("DNREC") wherein Croda was found to have violated, *inter alia*,   *7 Del.C.  §6003(a)(1)* through the unpermitted release of Ethylene Oxide and 3.38 of Permit APC-2016/0068- Construction (Amendment 3) by not maintaining and operating its facility in a manner consistent with good air pollution control practice for minimizing emissions, when it used the incorrect gasket that ultimately failed and resulted in the release of Ethylene Oxide emissions on November 25, 2018.[18] The federal Occupational Safety and Health Administration, DNREC and other state agencies imposed more than $500,000 in fines and penalties on Croda for operating the plant without proper inspection, failure to train workers adequately, and other failures leading up to the leak.

35.    The EPA's 2014 National Air Toxics Assessment ("NATA"), a screening tool for state, local and tribal agencies to assist them in identifying pollutants and emissions in their communities, demonstrated severe cancer risks in the area surrounding the Atlas Point plant. The

---

[17] https://dnrec.alpha.delaware.gov/croda-questions-answers/
[18] Q & A: Croda Ethylene Oxide Release November 25, 2018, November 19, 2019, https://dnrec.alpha.delaware.gov/croda-questions-answers/

2014 NATA places the cancer risks of the census tracts measured in and around Atlas Point as the highest in Delaware and among the highest in the country.

36.    The NATA database also makes clear that the elevated cancer risks in and around Atlas Point are almost entirely a result of Croda's EtO emissions.

37.    While the 2014 NATA reveals shockingly high risks of cancer across a large area near the Atlas Point plant, these risks are likely understated as they do not reflect the totality of Croda's emissions.

38.    New Castle County, where the Atlas Point facility is located, is the smallest county in the state by area, but has the highest population and population density of any county in Delaware.

39.    Throughout the period of exposure, the area around the Atlas Point plant has contained numerous homes and businesses, as well as numerous schools and daycare facilities. As a result, thousands of residents have been exposed to elevated levels of EtO.

40.    Defendant operated without sufficient pollution controls to limit and/or eliminate the emissions of toxic EtO and, as a result, exposed thousands of residents in neighboring areas to a carcinogenic, mutagenic chemical that materially diminished their health and increased their likelihood of developing cancer.

41.    Defendant knew that: (1) its manufacturing facility operated without sufficient pollution control systems necessary to reduce the releases of EtO to a non-harmful level; (2) the release of EtO spread well beyond the property boundaries of the Atlas Point plant; and (3) on-going exposure to EtO, a known carcinogen, would unnecessarily diminish the health of nearby residents and an increase the likelihood that nearby residents would develop cancer.

42.     Defendant negligently failed to implement control processes that would eliminate EtO emissions, failed to adopt alternative processes that would eliminate EtO emissions, and failed to warn the Plaintiff and Class Members that the air was materially contaminated with toxic levels of EtO.

43.     Defendant's conduct unnecessarily contaminated the air Plaintiff and Class Members breathe every day, and exposed Plaintiff and Class Members to unsafe air. As a result, Plaintiff and Class Members have inhaled toxic carcinogenic gasses.

44.      Throughout the course of its operation of the Atlas Point Plant, Defendant released EtO into the environment and failed to remediate the contamination that it has caused.

**E.     PLAINTIFF AND CLASS MEMBERS HAVE SUFFERED DAMAGES AND REQUIRE DIAGNOSTIC TESTING**

45.     Plaintiff and Class Members have lived within the vicinity of the Atlas Point plant during the time Defendant has been emitting and exposing the residents of nearby areas to toxic levels of EtO.

46.     As a result of Defendant's negligent and reckless emissions of EtO, Plaintiff and Class Members have suffered significant exposure to hazardous EtO gases.

47.     EtO is a proven human carcinogen and is unsafe for human consumption at any level of exposure.

48.     Plaintiffs and Class Members so exposed live in a census tract which poses a materially increased risk of developing cancer, as compared to the vast majority of the U.S. population living in other areas.

49.    As a proximate result of Defendant's conduct, Plaintiff and Class Members are at an increased risk of developing cancer, and periodic diagnostic medical examinations are reasonably necessary.

50.    Diagnostic testing for early signs or symptoms of cancer is reasonably medically necessary to assure early diagnosis, effective treatment of the disease, and to mitigate the risks caused by Defendant's negligence.

51.    As a result of that exposure Plaintiff and Class Members require an award of the cost of a medical monitoring program necessary to detect the onset of physical harms, illnesses, disease processes or disease.

52.    Monitoring procedures exist that make the early detection of cancer, the disease processes of cancer, and the progression of biomarker abnormalities possible. These monitoring procedures will benefit Plaintiff and Class Members, are different from what would normally be recommended in the absence of EtO exposure and are reasonably necessary due to Plaintiff and Class Members' exposure to Defendant's EtO emissions.

53.    As a direct result of Defendant's conduct, Plaintiff and the Class are in need of the costly diagnostic testing and the cost of the monitoring procedures that are reasonably necessary to enable Plaintiff and Class Members to obtain early detection and diagnosis of medical conditions, including abnormalities indicative of cancer.

54.    Plaintiff and Class Members seek as damages the costs of such diagnostic testing for the early detection of injury and to allow for early treatment beneficial to Plaintiff and Class Members. Diagnostic testing will identify the need for adequate treatment, management, and rehabilitation in the event cancer is diagnosed.

55.     Plaintiff and Class Members also seek all other available and necessary relief in connection with this claim.

## CLASS ALLEGATIONS

56.     Plaintiff seeks relief on behalf of herself and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a class defined as follows:

> All natural persons, who are currently citizens of Delaware, and who have resided within census tracts 10003015400, 10003105502 and 10003015802 (the "class zone") for a period of one year or more, at any point between January 1, 1988 and the date of this complaint (the "Class Period").



Fig. 1: The Class Zone is represented in the dark purple and light blue shaded areas. The green and yellow shaded areas lie outside of the Class Zone. The Atlas Point facility is designated by the brown dot.

57.     Excluded from the Class are Defendant and any of its affiliates, parents or subsidiaries; all employees of Defendant; all persons who have been diagnosed with cancer; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

58.     Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

59.     The proposed Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

60.     **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the Members of the Class are so numerous and geographically dispersed that the joinder of all Members is impractical.  While the exact number of Class Members is unknown to Plaintiff at this time, the proposed Class includes thousands of residents who were unlawfully exposed to EtO. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

61.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.      Whether Defendant's conduct was negligent;

b.      Whether Defendant owed a duty of care to Class Members;

    c.       Whether the duty of care owed to the Class included the duty to protect against exposures to unsafe and unnecessarily high levels of EtO emissions;

    d.       Whether Defendant breached its duty to warn the Class of and protect the Class from the long-term health risks and consequences of exposure to high levels of EtO;

    e.       Whether medical monitoring and early detection will provide benefits to Members of the Class;

    f.       Whether Plaintiffs and Class Members are entitled to relief.

62.    **Typicality. Fed. R. Civ. P. 23(a)(3).**  Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of the putative Class Members.  Plaintiff resides in census tract 10003015802, within the Class Zone surrounding the Atlas Point facility, and has resided in the Class Zone for over one year. Plaintiff's damages and injuries are akin to those of the Class Members, and Plaintiff seeks relief consistent with the relief of the Class Members.

63.    **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a Member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class.   Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

64.    **Superiority. Fed. R. Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this

class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

65. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

66. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

67. Finally, all Members of the proposed Class are readily ascertainable as they are all current or former residents of defined tracts. Class Members can be identified, and their contact information ascertained for the purpose of providing notice to the Class.

**COUNT I**
**NEGLIGENCE**

68. Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

15

69.     Defendant owed Plaintiff and Class Members a duty to operate its Atlas Point plant in a manner which would not cause Plaintiff and Class Members injury or harm.

70.     Defendant negligently breached its duty of care by releasing and allowing the release of EtO from its Atlas Point Plant, by failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO, and by releasing EtO into a heavily populated community.

71.     Defendant owed Plaintiff and Class Members a duty of reasonable care commensurate with the risk of operating the Atlas Point Plant.

72.     Given the likelihood of contamination of neighboring areas and exposure to their occupants, Defendant had a duty to investigate the extent to which EtO released from the Atlas Point facility was likely contaminating the air at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

73.     Defendant negligently breached its duty by, *inter alia:*

    a.  Emitting dangerous volumes of EtO into the air;

    b.  Failing to employ safe methods to adequately control or eliminate EtO emissions from the facility;

    c.  Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

    d.  Failing to locate its EtO processing to an unpopulated, or at least much less populated, area;

    e.  Failing to warn neighboring residents being exposed to EtO at levels that increase their exposure to disease.

74.     As a direct and proximate result of Defendant's negligence, Plaintiff and the Class Members have suffered and will continue to suffer injuries, damages, and loss.

**COUNT II**
**ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY**

75.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

76.     Defendant's use and emission of EtO at its Atlas Point plant constitutes an ultrahazardous activity.

77.     Processing EtO and converting it into Ethylene Glycol is abnormally dangerous and cannot be made safe by the exercise of the utmost care. The procedures utilized at the Atlas Point plant resulted in emissions of EtO to surrounding neighborhoods, which poses a high degree of risk to Plaintiff and Class Members.

78.     There is likelihood that emissions of EtO will result in life-threatening cancer. This risk cannot be eliminated as long as EtO is emitted into populated areas. Likewise, it was completely inappropriate for Defendant to locate and operate their Atlas Point plant in a populated area while at the same time causing large volumes of EtO to be emitted into the atmosphere.

79.     Defendant's emission of EtO created a high degree of risk to those who live in the surrounding area and substantially increased their risk of developing cancer and related diseases.

80.     The activities conducted by Defendant are exceedingly dangerous and offer little or no value to the surrounding community.

81.     Because these activities are ultrahazardous, Defendant is strictly liable for any injuries proximately resulting therefrom.

82.     As a direct and proximate result of Defendant's ultrahazardous activities, Plaintiff and Class Members were significantly exposed to EtO and have suffered and will continue to suffer injuries, damages, and loss.

<u>COUNT III</u>
**MEDICAL MONITORING**

83.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

84.     Plaintiff and Class Members have been significantly exposed to EtO levels that are far higher than normal background levels. EtO is a dangerous carcinogen that has been proven to cause cancer in humans.

85.     Plaintiff and Class Members were exposed to EtO due to Defendant's tortious actions.

86.     As a proximate result of their exposure to EtO, Plaintiff and Class Members have a significantly increased risk of contracting several different types of cancer. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

87.     Monitoring procedures exist that makes early detection of these cancers possible and beneficial. These monitoring procedures are different than those normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiff's and Class Members' exposures to EtO.

88.     As a result, Plaintiff and the Class should be awarded the quantifiable costs of such a monitoring regime.

## COUNT IV
## WILLFUL AND WANTON CONDUCT

89.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

90.    At all times relevant, Defendant owed a duty to refrain from willful and wanton conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its facility.

91.    Notwithstanding its duty, Defendant breached its duty by, among other things:

   a.   Emitting dangerous volumes of EtO into the air;

   b.   Failing to employ safe methods to adequately control EtO emissions from its facility;

   c.   Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

   d.   Failing to locate its EtO processing facilities in an unpopulated area; and

   e.   Failing to warn neighboring residents that were being exposed to EtO at levels that increase their exposure to disease;

92.    As a direct and proximate result of Defendant's willful and wanton conduct, Plaintiff and Class Members have suffered and will continue to suffer injuries, damages, and loss.

## COUNT V
## PUBLIC NUISANCE

93.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

94.    At all times relevant hereto, Defendant knew EtO to be hazardous and harmful to human beings.

95.     Plaintiff and Class Members have a common right to breathe clean air without dangerous levels of carcinogens such as EtO.

96.     Defendant's unreasonable use and emission of EtO at its Atlas Point facility substantially and unreasonably infringes upon and transgresses this public right.

97.     Defendant knew or should have known that the levels of EtO gas emitted from its facility would have a deleterious effect upon the health, safety, and well-being of people living in the nearby areas.

98.     Defendant's operation of its Atlas Point facility caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

99.     As a proximate result of the Defendant's operation of its facility, Plaintiff and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

100.    As a proximate result of Defendant's operation of its facility, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

101.    As a proximate result of Defendant's use and emission of EtO, Plaintiff and Class Members sustained and will continue to sustain damage to their health.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.    For an Order certifying the Class, as defined herein, and appointing Plaintiff and their Counsel to represent the Class;

b.    For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

c.    To fund a medical monitoring program in an amount determined just and reasonable;

d.    For an award of punitive damages as allowed by law and in an amount to be determined;

e.    For an award of attorney's fees, costs, and litigation expenses, as allowed by law;

f.    For prejudgment interest on all amounts awarded;

g.    For injunctive and declaratory relief, as allowed by law; and

h.    Such other and further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a jury trial on all issues so triable.

Dated:  December 10, 2019                    Respectfully submitted,

*/s/ ANDREW R. FRISCH*
Andrew R. Frisch
NJ Bar No. 38452000
MORGAN & MORGAN, P.A.
8151 Peters Road, Suite 4000
Plantation, FL 33324
AFrisch@forthepeople.com
T: (954) WORKERS; F: (954) 327-3013

T. MICHAEL MORGAN*
FL Bar No. 0062229
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031; F: (407) 245-3384

JOHN A. YANCHUNIS*
FL Bar No. 324681
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@ForThePeople.com
P: (813) 223-5505; F: (813) 223-5402

RENE F. ROCHA*
LA Bar No. 34411
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P: (954) 318-0268; F: (954) 327-3018

FRANK PETOSA*
FL Bar No. 972754
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
8151 Peters Road, Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 318-0268; F: (954) 327-3018

*Pro Hac Vice forthcoming

*Attorneys for the Plaintiff and Putative
Class*